UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION


| | | |
|---|---|---|
| SALINA RILEY | ) | |
| Plaintiff | ) | CASE NO.  16-CV-_____ |
| | ) | |
| V. | ) | Judge |
| | ) | |
| WELLS FARGO BANK N.A. | ) | Mag. |
| Defendant | ) | |


SERVE:
CSC - LAWYERS INCORPORATING
SERVICE COMPANY
421 WEST MAIN STREET
FRANKFORT, KY 40601

_____

Complaint Seeking Statutory, Actual and Punitive Damages Under the Servicemembers Civil
Relief Act for an Unlawful Seizure of a Personal Residence of an Active Duty
Servicemember, and Violations of the Kentucky Consumer Protection Act, Common Law
Conversion, Attorney Fees, and Jury Demand
_____

Comes now Plaintiff, Master Sergeant of the United States Army Reserves, Ms. Salina
Riley, and for her Complaint against her mortgage holder, Wells Fargo Bank, N.A.  states as
follows.

## INTRODUCTION

1. This is an action for actual, statutory and punitive damages, declaratory and injunctive
   relief, costs and attorney's fees, filed by Plaintiff, Salina Riley for the illegal seizure and
   collection practices of Wells Fargo pursuant to the Civil Servicemember's Relief Act
   (SCRA), at 50 USC § 3953, the Fair Debt Collection Practices Act at 15 U.S.C. § 1696 *et
   seq*, for state law claims under the Kentucky Consumer Protection Act, and various
   common law claims.

## JURISDICTION AND VENUE

2. The Plaintiff, Salina Riley, is a Master Sergeant in the United States Army Reserves, a police officer with the Lexington Fayette Urban County Government, is a resident of the city of Richmond, Madison County, Commonwealth of Kentucky, and is a "Servicemember" as defined by the SCRA , and a "consumer" as defined by the Fair Debt Collections Practices Act (FDCPA), and Kentucky Consumer Protection Act (KCPA).

3. Defendant, Wells Fargo NA, hereinafter "Wells Fargo," is a foreign national bank, registered to do business in the Commonwealth of Kentucky with the Secretary of State of the Commonwealth of Kentucky,  has a principal place of business at 464 California Street, San Francisco, California, 94104, and is a "debt collector" as defined by 15 U.S.C § 1696(a)(6) for purposes of the FDCPA.

4. The personal residence of Ms. Riley and her six year old daughter, and the property that is the subject of this lawsuit is located in the city of Richmond, Madison County, Commonwealth of Kentucky, and more commonly known as:  253Percheron Dr., Richmond, KY  40475.

5. Jurisdiction is proper as this case is brought pursuant to 50 USC §3953 and 15 U.S.C. § 1696 *et seq,* in that this dispute involves predominant issues of federal law, and this Court has ancillary jurisdiction of the state law claims pursuant to 28 U.S.C § 1367, in that the claims herein arose out of the same basic facts, which give rise to the principal federal claim.

6. The amount in controversy exceeds the jurisdictional limit.

7. Venue is proper in the Lexington Division, Eastern District Federal Court, as all transactions and factual issues in dispute took place within the limits of Madison County, and is where the personal residence of Ms. Riley is located.

## STATEMENT OF FACTS

8.  Plaintiff, hereinafter Ms. Riley, has been a member of the Reserves for the United States Army for the last twenty-two (22) years, and currently maintains the title of Master Sergeant.

9.  When she is not deployed with her Army Reserves unit, Ms. Riley works full time as a police officer for Lexington Fayette Urban County Government.

10. Ms. Riley purchased her residence at 253 Percheron Drive in Richmond, Kentucky on February 8, 2012, prior to her most recent active duty deployment of March 18, 2015 to March 16, 2016.

11. Ms. Riley financed her home through Primelending, a Plainscapital Company, based out of Texas, for a total financed of $168,550, an APR of 4.25%, and principal and interest monthly payments of $829.16.

12. Upon information and belief, after February 8, 2012, the loan was sold by Primelending, and whether directly from Primelending or through a trust or other means, the subject mortgage loan was eventually purchased by Wells Fargo Bank, N.A.

13. At the time of the purchase, Ms. Riley was recently divorced, and having financial troubles due to a failure of her ex-husband to follow through on financial agreements in the Decree of Dissolution of marriage and fell behind on her payments to Wells Fargo.

14. On July 4, 2013 Ms. Riley executed a Loan Modification Agreement with Wells Fargo for an outstanding balance of approximately $166,426.49, an APR of 3.75%, and payments of $812.36. Payments on the permanent modification were scheduled to begin in September 2013.  *See* **Exhibit A.**

15. From July 2013 until August 2015, Ms. Riley made continuous monthly payments under the modified loan agreement through an ACH withdrawal out of her USAA checking account.

16. On March 18, 2015, Ms. Riley deployed to Ft. Bliss, Texas.

17. Ms. Riley was deployed to the Conus Replacement Center at Ft. Bliss.  Her duty was Non Commissioned Officer in charge of Operations for Civilians (NCOIC).  She and her team deployed between 80-200 civilians a week to over twenty-two (22) different countries in support of our troops.  She and her team were charged with tracking daily accountability, medical appointments, and classes done, to ensure all the deadlines were met in order to validate the flights out on Friday every week.  Her team was also in charge of all the flight manifests for her passengers.  On flight days her team would verify passports, identifications, baggage, and board them for flights to Kuwait and all twenty-two (22) countries beyond.  Saturdays were off days, and then the process started all over again on Sunday to prepare for the next week's round of personnel, stopping only one week for Christmas.

18. In May 2015, Ms. Riley began to experience financial difficulties due to keeping up two residences as a single parent, and struggled to make the $549.12 bi-monthly payments to Wells Fargo.

19. In June 2015, Ms. Riley's six year old daughter came to Texas to live on base with her mother.  When Ms. Riley paid the rental unit's deposit and first month's rent it stressed an already taxed budget.

20. Ms. Riley suspended the ACH debit for the July 1, 2015 payment, due to the large payment for apartment, and the ACH was to be reinstated on July 29, 2015, per letter of Wells Fargo, dated June 30, 2015.  *See* **Exhibit B.**

21. In August 2015, Ms. Riley discovered that she was a victim of identity theft, and someone was using her USAA account to make substantial unauthorized purchases.

22. The USAA branch investigated the breach and theft of Ms. Riley's funds, and refunded the amount withdrawn by the identity thief, but left Ms. Riley to deal with NSF payments and fees during the time the account was overdrawn.

23. After Ms Riley notified Wells Fargo the reason for the returned payment in August, she paid one full months payment of $1091.26 on September 17, 2015, which was

authorized by phone in an attempt to restart the automatic withdrawals of the monthly payments.

24. Ms. Riley expected to make another payment of $1091.26 within a few weeks of September 17, 2015, but when she called to make the payment, all partial payments were refused, and the agent demanded payment in full on all arrears.

25. Meanwhile, Wells Fargo continued to send notices of the missed payments to the home address in Richmond, Kentucky where her mother, who was maintaining and watching over the home, received them.

26. Ms. Riley updated her address with Wells Fargo, but the apartment number was entered in error, and none of the mailings sent to Texas ever made it to her, and the only notices received were by Ms. Riley's mother, at her home address.

27. Ms. Riley, on an active duty mission in defense of our country, overseeing the deployment of hundreds of civilians every week, was forced to spend hours of her time correcting the errors of the notice address, emailing her single point of contact, making payments over the phone, all in an effort to bring her loan current.

28. When Ms. Riley called to phone in the next month's payment,  Wells Fargo refused to accept any further money on the account, and demanded payment in full on the arrears Wells Fargo claimed Ms. Riley owed.

29. So, taking time again away from her mission—again—Ms. Riley was referred to the Home Preservation Unit of Wells Fargo to discuss her alternative options to payment on her home loan Wells Fargo claimed was in default.

30. In December 2015, Wells Fargo sent a Forbearance Agreement to Ms. Riley. The terms Wells Fargo offered under the agreement were to pay $300 a month instead of her monthly payment for a period of three months: February, March, and April of 2016. *See* **Exhibit C.**

31. Ms. Riley accepted and returned the signed Forbearance Agreement.

32. On December 21, 2015, while Ms. Riley worked in defense of our country to oversee the weekly deployments of civilian soldiers overseas, Wells Fargo unlawfully entered and trespassed into the primary residence of an active duty soldier.

33. Despite knowing that Ms. Riley was deployed and despite the fact that Ms. Riley had been conversing with Wells Fargo representatives almost daily, Wells Fargo wrongfully and in bad faith made the determination that the property--furnished and with running water and electrical service--was vacant and took abusive, unreasonable, and unnecessary steps to "secure" Ms. Riley's home.

34. To "secure" the home, Wells Fargo broke into the home and caused property damage both from the manner of the entry and the actions taken within.

35. At no time did Wells Fargo request a Court Order to obtain authorization for this unlawful seizure.

36. Wells Fargo unlawfully entered the residence by drilling through the door locks and taking a crow bar to the door frame, and upon entering proceeded to rifle through the items in the home, changed the locks, and posted a notice on the front door, and—on their way out—left the back door open and unsecured.

37. The Notice that Wells Fargo posted on the property was a large white paper, conspicuously posted on the front door, and in plain view of the street, and anywhere in the front of the home.

38. Ms. Riley's family and friends, who were caring for her home while she was deployed, discovered the notices after Christmas, and told Ms. Riley of Wells Fargo's actions, advising her specifically that Wells Fargo had left the back door open and unlocked.

39. Furious and overwhelmed with the helplessness of her situation, Ms. Riley emailed Mr. Anthony Bennum of the Executive Resolution Team to advise of the unlawful, unauthorized, and unnecessary trespass, and demanded that agents of Wells Fargo no longer be allowed to enter  her home while she was deployed.

40. Ms. Riley's family removed the postings and re-secured the property up at the request of the deployed soldier.

41. On January 10, 2016, Wells Fargo came back to the property and reposted the large and conspicuous Notice on the exterior door, and broke in through the side door as the keys in the changed locks no longer allowed him to gain access to the property.

42. After Wells Fargo committed the second trespass into the home, they took steps to winterize the property by shutting off the water and the electric, and posting signs internally at the sinks and the toilets.

43. In short, while Ms. Riley was deployed with the armed services and working simultaneously to recover from a hack of her checking account, Wells Fargo was taking unlawful steps to "secure" a "vacant" property that it knew was the home of a deployed member of the United States Army.

44. Sometime after Wells Fargo posted the large and conspicuous notices on the outside of the home, outside patio items such as the gas grill and lawn furniture disappeared from the home between visits by Ms. Riley's family and friends.  At no time prior to the notices did Ms. Riley's family notice items being removed from the back or front porches or patios.

45. Ms. Riley experienced severe stress and overwhelming anxiety about what was happening at the home of her and her daughter, all the while she was stuck in Texas completing her mission unable to do anything to stop it.

46. The stated legislative purpose of the SCRA is to ensure that deployed members of our armed forces can focus 100% of their energies on the mission they are deployed to execute.

47. Upon information and belief, during the servicing of the alleged default on the loan, Wells Fargo has been assessing miscellaneous fees on this account since Wells Fargo received Ms. Riley's notice of deployment.  Under the SCRA, all fees count towards the 6% APR cap, including but not limited to, late fees, default fees, BPO fees, inspection

fees, and contractor fees.  Upon information and belief, the fees Wells Fargo assessed on this loan are in excess of the 6% cap.

48. Until she was released from active duty, Ms. Riley continued to make demands of Wells Fargo to stop sending agents to her home, and to make arrangements for the property damage that had occurred.

49. On February 1, 2016 Ms. Riley made her first forbearance payment, and has since made all subsequent payments under the agreement.

50. But before she had completed her mission, and could return home, an agent of Wells Fargo committed a third trespass when they took steps to "un-winterize" Ms. Riley's home, unannounced and unknown to Ms. Riley.

51. Ms. Riley's mother advised her that someone had entered the house to turn the water back on and that the postings on the interior had been removed.

52. On March 16, 2016, Ms. Riley's mission ended, and she had orders to return home to Richmond, when she discovered all the damage Wells Fargo had done to her home.

53. She discovered issues with both her plumbing and her appliances that were all in perfect working order before she was deployed.

54. The washing machine had a large puddle that seeped out the front of the machine when used, and a plumber had to come out to repair it.

55. The dishwasher also began leaking from  underneath creating further need for a plumber.

56. The refrigerator also stopped working, as no steps were taken to prepare it for having no access to electricity for an unknown period of time after Wells Fargo shut off the power.

57. To date, the repairs have not been made to any of the damage to the doors, and no permanent solution has been offered by Wells Fargo to resolve the outstanding issues on this loan.

58.  Since her return home, Ms. Riley has discovered missing items throughout her home, including but not limited to, ammunition, tools, and her gas grill.

**COUNT ONE:**
**VIOLATION OF THE SERVICEMEMBERS CIVIL RELIEF ACT (SCRA) AT 50 U.S.C. § 3953,**
**FOR UNLAWFUL SEIZURE WITHOUT A COURT ORDER**

59.  Plaintiff incorporates by reference, paragraphs one (1) through fifty-eight (58) of the Complaint,  as if restated herein, and further states that the actions taken by the Defendant constitute a violation of the SCRA.

60.  Ms. Riley was on active duty at the time of the breach of her obligations under her modified mortgage note, and that deployment materially impaired her ability to address the situation at her residence in Richmond, Kentucky.

61.  At all times relevant, Wells Fargo was aware of the deployment of Ms. Riley.

62.  Wells Fargo unlawfully seized Ms. Riley's home, property that was not in foreclosure, was not vacant, and did not receive Court permission to take any action against the active duty and deployed Servicemember.

63.  Wells Fargo was aware of the active duty status, as Mr. Riley had submitted to Wells Fargo copies of her Orders, and  she was in almost daily contact with an agent of Wells Fargo regarding the hack and forbearance agreement.  All communications were sent from her military email account, that were marked unclassified.

64.  Wells Fargo violated terms of the SCRA related to active duty deployment, for unlawful seizure of the servicemember's residence.

65.  Plaintiff is entitled to actual and punitive damages in an amount to be determined at trial, and attorney fees for this violation.

**COUNT TWO:**
**VIOLATION OF THE SCRA 50 U.S.C. § 3937, VIOLATION FO THE**
**MAXIMUM RATE OF INTEREST CHARGE TO SERVICEMEMBERS**
**DEPLOYED ON ACTIVE DUTY**

66. Plaintiff incorporates by reference, paragraphs one (1) through fifty-eight(58) of the Complaint,  as if restated herein, and further states that the actions taken by the Defendant constitute a violation of the SCRA.

67. Wells Fargo received copies of Ms. Riley's Orders, and was sufficiently advised of her status on active duty.

68. Upon information and belief, Wells Fargo violated the maximum interest provision, which includes service charges, renewal charges, BPO's, inspection fees, and any other fees or any other charges with the loan,  and charged Ms. Riley an interest rate in excess of 6% given the charges incurred on this loan.

69. All charges in excess of 6% must be forgiven and removed from the loan, and not simply reamortized, Wells Fargo failed to take this action on Ms. Riley's loan balance.

70. Plaintiff is entitled to declaratory relief as to these unlawful charges, actual and punitive damages in an amount to be determined at trial, and attorney's fees.

**COUNT THREE:**
**USURY**

71. Plaintiff incorporates by reference, paragraphs one (1) through fifty-eight(58) of the Complaint,  as if restated herein, and further states that the actions taken by the Defendant constitute a usury claim.

72. At all times relevant to the transaction, the mortgage and security interest have been subject to the requirements of KRS 360.010 and KRS 360.020.

73. Kentucky prohibits the "taking, receiving, reserving, or charging a rate of interest greater than is allowed by KRS 360.010," and "when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it."  KRS 360.020.

74. The original loan contract has a stated interest of 4.25% which was modified to 3.875%, but upon notice of deployment of the Servicemember, the maximum interest, including all fees assessed, is capped by statute at 6% under 15 U.S.C § 3937.

75. Upon information and belief, Wells Fargo is charging fees and expenses on Ms. Riley's loan that are causing an interest rate of greater than 6% to be incurred.

76. Wells Fargo is charging interest at a rate greater than the contract allows.

77. As a direct cause of the above described conduct, Ms. Riley incurred damages in an amount to be determined at trial, and is entitled to relief for the usury claims, and must forfeit all interest paid upon the mortgage, and Plaintiff is entitled to an award of damages equal to twice the interest paid.

### COUNT FOUR:
### VIOLATIONS OF THE FAIR DEBT COLLECTIONS PRACTICES ACT
### 15 U.S.C. § 1696(f)

78. Plaintiff incorporates by reference, paragraphs one (1) through fifty-eight (58) of the Complaint,  as if restated herein, and further states that the actions taken by the Defendant constitute a violation of the FDCPA.

79. Collection of a mortgage debt is covered under the Fair Debt Collections Practices Act as lenders are "debt collectors" under the act attempted to "collect a debt." *Glazer v. Chase Home Fin. LLC*, 704 F.3d 453 (6th Cir. Ohio 2013).

80. Wells Fargo took non-judicial action by unlawfully seizing, on multiple occasions, the primary residence of Ms. Riley, and these unlawful seizures violated the FDCPA at 15 U.S.C § 1696(f)(6).

81. Plaintiff is entitled to statutory damages of $1000, actual and punitive damages in an amount to be determined at trial, and attorney's fees for the violations of the Act.

## COUNT FOUR:
## KENTUCKY CONSUMER PROTECTION ACT

82. Plaintiff incorporates by reference, paragraphs one (1) through fifty-eight (58) of the Complaint,  as if restated herein, and further states that the actions taken by the Defendant constitute a violation of the KCPA.

83. KRS  367.170 forbids unfair, false, misleading or deceptive acts in trade or commerce.

84. Wells Fargo and its agent who performed the winterization and changed the locks engaged in an unconscionable and deceptive act by unlawfully seizing the home of a servicemember deployed after an erroneous determination that the property was vacant.

85. Plaintiff is entitled to actual and punitive damages, and attorney's fees for the violation.

## COUNT FIVE: TRESPASS

86. Plaintiff reiterates the allegations contained in the paragraphs above, as if fully set forth herein.

87. Defendant and/or Defendant's agents or employees intended to enter onto Plaintiff's property.

88. Defendant and/or Defendant's agents or employees entered onto Plaintiff's property without permission and/or remained on Plaintiff's property after any permission lapsed.

89. The actions of Defendant and/or Defendant's agents or employees have caused injury to Plaintiffs.

## COUNT SIX: BREACH OF CONTRACT

90. Plaintiff reiterates the allegations and responses contained in the paragraphs above as if fully set forth herein.

91. The parties' Note is a negotiable instrument governed by Article 3 of the Uniform Commercial Code, adopted by the Kentucky legislature as KRS 355.3-101, et seq.

92. KRS 355.1-304 imposes "an obligation of good faith in its performance and enforcement" on every contract or duty within the Uniform Commercial Code."

93. Furthermore, the Plaintiff's mortgage requires that any inspection or "securing" of the property be "reasonable". Defendant's acts were not reasonable.

94. By engaging in the above-described acts, Defendant breached the contract and caused injury to Plaintiff.

### COUNT SEVEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

95. Plaintiff reiterates the allegations contained in the paragraphs above as if fully set forth herein.

96. The conduct of the Defendant was outrageous in that it offends the generally accepted societal standards of decency and morality.

97. The conduct of the Defendant was intentional and/or reckless.

98. The conduct of the Defendant has caused the Plaintiff to suffer severe mental and emotional distress.

WHEREFORE, Plaintiff requests that this Court:

1. Grant a jury trial;

2. Order an injunction preventing the Defendant from foreclosing on the Plaintiff for any default resulting from the Defendant's refusal to accept further payments on the loan;

3. Award Plaintiff compensatory and statutory damages;

4. Award Plaintiff punitive damages as allowed by 50 U.S.C. § 4042, KRS 367.170, *et seq.*;

5. Award Plaintiff such equitable relief as this Court deems proper;

6. Allow Plaintiff to amend her Complaint upon completion of discovery;

7. Order Defendant to pay Plaintiff's attorney's fees as allowed by KRS 367.170, *et seq.*; and 50 U.S.C § 4042(b)

8.   Award the Plaintiff any and all other relief to which she appears entitled.

Respectfully Submitted;

_/s/Stefanie Ebbens Kingsley_____
Stefanie Ebbens Kingsley
**Stefanie Ebbens Kingsley Law, PLLC**
801 Master Street, Suite 4
Corbin, KY  40701
(606) 260-2565
stefanie@sek-law.com

_/s/ Ben Carter_____
Ben Carter
**Ben Carter Law, PLLC**
900 S.  Shelby Street
Louisville, KY  40203
(502) 509-3231
ben@bencarterlaw.com